IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LADERIAN McGHEE,

                                          OPINION AND ORDER
Plaintiff,

                                       13-cv-67-bbc

     v.

DALIA SULIENE, KAREN ANDERSON
and LON BECHER,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Pro se plaintiff Laderian McGhee is proceeding on claims that defendants Dalia Suliene, Karen Anderson and Lon Becher violated his rights under the Eighth Amendment and Wisconsin negligence law, primarily by delaying surgery he needed for his shoulder and refusing to provide adequate pain medication while he waited for surgery. Defendants have filed two motions for summary judgment, one related to plaintiff's federal claims and one related to his state law claims. Dkts. ##30 and 67. I conclude that there are disputed factual issues with respect to plaintiff's claims that defendant Suliene, a prison physician, violated plaintiff's state and federal rights by interfering with plaintiff's appointment for an MRI arthrogram and by failing to treat his shoulder pain. I am granting defendants' motion

in all other respects and dismissing the complaint as to defendants Anderson and Becher.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

UNDISPUTED FACTS

Plaintiff Laderian McGhee is a prisoner in the custody of the Wisconsin Department of Corrections at the Columbia Correctional Institution, where he was housed during the events relevant to this case.  In November 2011, plaintiff submitted a health service request in which he complained that he was experiencing "extreme pain" in his shoulder.  (Although plaintiff wrote that he had been in pain "for months," it is undisputed that November 2011 was the first time he complained about it.  Dfts.' PFOF ¶ 31, dkt. #32; Plt.'s Resp. to Dfts.' PFOF ¶ 31, dkt. #82.)  He asked to see a doctor, writing that "it cannot wait."  In response, defendant Dalia Suliene, a physician at the prison, wrote that plaintiff was "scheduled to see [a doctor] soon."  In addition, she ordered pain rub, naproxen and nortriptyline, the last of which is a drug to make the naproxen more effective, ease muscle spasms and help with sleep.

In a health service request dated November 23, 2011, plaintiff asked for a nurse to be present during his visits with defendant Suliene because he was concerned that she would not provide adequate care.  In response, defendant Lon Becher, the health services nursing

2

coordinator, agreed to be present at plaintiff's next appointment.  (Plaintiff says that he was concerned because Suliene recently had refused to treat his foot pain and got upset with him, stating, "We're done!" and "storm[ing] out of the room" after plaintiff "pleaded with her to help him do something about his foot pain."  McGhee Decl. ¶ 54, dkt. #85.  After plaintiff filed a grievance against Suliene, she referred plaintiff to the psychiatrist on the ground that there "may have been a psychological component to his bunion pain."  Dfts.' Resp. to Plt.'s 2d Set of Interr., no. 1, dkt. #97.)

In a health service request dated November 27, 2011, plaintiff complained that he had not received any treatment for the "unbearable" pain in his shoulder and that he was being mistreated "because of the ongoing conflict between Dr. Suliene & I."  In response, health care staff wrote that plaintiff was "scheduled to see the doctor" and reminded plaintiff that he had received pain rub and naproxen.

On November 30, 2011, defendant Suliene examined plaintiff with defendant Becher present.  Plaintiff stated that the nortriptyline was causing seizures and sleeping problems.  Suliene ordered x-rays and physical therapy and substituted ibuprofen for naproxen "due to intolerance."  (Defendant Suliene does not explain what she meant by "intolerance" and she does not identify the basis for her opinion.  However, in health service requests dated August 25, 2009, October 13, 2011 and October 25, 2011, plaintiff complained that he was "allergic" to naproxen and it made him vomit.  The parties dispute whether Suliene told

3

plaintiff that she would not "give him anything else" for his right shoulder pain because she did not believe that there was a "problem with his shoulder."  McGhee Decl. ¶ 51, dkt. #85.)

On December 6, 2011 x-rays were taken of plaintiff's right shoulder.  The results were normal.  On December 7, 2011, defendant Suliene ordered six visits with a physical therapist.

In a health service request dated January 8, 2012, plaintiff asked to see a doctor and asked for new pain medication because his shoulder was "killing [him] at night" and the nortriptyline was causing seizures and sleeplessness.  In a response, health care staff wrote that he was scheduled to see the doctor.

On January 17, 2012, a physical therapist ordered an extra pillow for plaintiff and an ice bag twice a day after work and at bedtime.

On January 18, 2012, defendant Suliene examined plaintiff, noting that he showed no muscle atrophy.  (The parties dispute whether plaintiff could lift his right arm and whether plaintiff refused a steroid injection.  Plaintiff says that Suliene told him that he did not need an injection because he had received "shock treatment" from the physical therapist.)  Suliene renewed plaintiff's ibuprofen prescription and planned to reevaluate plaintiff after he finished physical therapy.

In a health service request dated February 19, 2012, plaintiff wrote that he was in pain "all the time" and that his pain medication was "not working at all."  He asked "to see

4

a shoulder specialist at once!!" and for "pain meds that work." In response, health care staff wrote that plaintiff did not have an appointment with a specialist, but asked whether plaintiff would like to be seen by a nurse.

On February 28, 2012, defendant Suliene examined plaintiff. (The parties do not identify the reason for the appointment, but presumably, it was scheduled in response to plaintiff's February 19 request.) Plaintiff told Suliene that he had pain in his right shoulder, which was worst at night and that the pain rub, extra pillow and ibuprofen were not working. In addition, the nortriptyline "caused a reaction." He could not raise his arm above his head. (The parties dispute whether Suliene told plaintiff that there was nothing she could do for plaintiff's pain.) The following day, Suliene ordered an evaluation by Ellen O'Brien, an orthopedic consultant for the department.

In March 2012, health care staff provided acetaminophen to plaintiff in response to his complaints of shoulder pain.

On March 23, 2012, plaintiff met with the orthopedic consultant, who recommended a right shoulder MRI arthrogram, a procedure used to check for tears in the shoulder joint. On March 26, 2012, defendant Suliene requested the arthrogram and a followup appointment with the orthopedic consultant; the request was approved the following day.

On April 27, 2012, the physical therapist discontinued the sessions in light of plaintiff's upcoming MRI arthrogram. However, the therapist concluded that plaintiff's

5

active range of motion had improved.

On May 4, 2012, defendant Suliene prescribed acetaminophen for plaintiff's pain. (The parties dispute whether plaintiff told Suliene that the acetaminophen he received previously from health care staff had not been working.)

On May 24, 2012, plaintiff was scheduled for an MRI arthrogram, but it never took place.  (Defendants say that plaintiff refused the procedure; plaintiff says that defendant Suliene never informed him of the appointment.)

On June 22, 2012, the orthopedic consultant decided not to schedule any further appointments with plaintiff until the MRI arthrogram had been performed.  The same day, defendant Suliene requested another MRI arthrogram for plaintiff.

On June 25, 2012, plaintiff was scheduled for another MRI arthrogram.  (The parties dispute whether plaintiff verbally refused to attend the appointment.  According to plaintiff, Suliene told him to sign a refusal form without telling him what the form was.  After he read the form and told Suliene he was not refusing treatment, she told him again to sign the form.)  On the "Refusal of Recommended Health Care form," plaintiff wrote, "I am not refusing this treatment, I will accept this treatment anytime!"

On July 18, 2012, plaintiff had an MRI arthrogram of his right shoulder.  The results showed the following:

1. Moderate to severe glenohumeral joint degenerative changes with diffuse

6

degenerative tearing of the labrum as detailed above.

2. Supraspinatus, infraspinatus and subscapularis tendinopathy without rotator cuff tear.

3. Longitudinal split tear of the intra-articular portion of the long head biceps tendon. Fluid is surrounding the biceps tendon sheath.

The same day, defendant Suliene ordered a followup appointment with the orthopedic consultant.

On July 27, 2012, plaintiff met with the orthopedic consultant.  (Plaintiff says that the consultant told him that if he did not have surgery "as soon as possible," he ran the risk of losing the use of his right arm.  The consultant says that she determined  from the MRI and her own examination that plaintiff's condition was chronic and gradual, not acute, so emergency treatment was not required.)   The consultant recommended an operative evaluation with an outside orthopedist, but she did not attempt to "jumpstart" the referral process by contacting the reviewing committee or the referral provider.  In addition, she recommended that plaintiff receive two extra blankets and that his orders for ice and an extra pillow be renewed.

The same day, defendant Suliene requested approval for a surgical orthopedic consultation and renewed plaintiff's orders for ice and an extra pillow.  On July 31, 2012, the request for a surgical consultation was approved.

(The parties dispute whether defendant Suliene refused to discuss plaintiff's shoulder

7

pain during an appointment on July 31 to address plaintiff's seizures.)

In a health service request dated August 1, 2012, plaintiff asked for more pain medication. In response, health care staff wrote that plaintiff was prescribed acetaminophen.

In a health service request dated August 14, 2012, plaintiff asked to see a specialist for his pain. In response, health care staff wrote that an appointment was scheduled for plaintiff.

In a health service request dated August 27, 2012, plaintiff wrote that his shoulder was in extreme pain and his pain medications stopped working "long ago." He asked to know why he had not been taken for surgery yet. In response, defendant Suliene wrote that plaintiff had not been asking for refills for his medication and recommended that he do so. (Plaintiff says that whenever defendant Suliene prescribed a new medication, he would take it for several weeks and then inform the health services unit when it became clear that the medication was not effective.)

In a health service request dated August 28, 2012, plaintiff asked again about the timing for his surgery, stating that he was in "extreme pain" at all times. In response, defendant Suliene wrote that his surgery consultation was scheduled in a "couple of months." In addition, she prescribed ibuprofen for plaintiff's pain.

In a health request dated September 11, 2012, plaintiff asked again when he was going to have surgery, stating that he was "in so much pain [he] can't even explain it" and

8

that the pain medication was not working.  In response, defendant Suliene stated that his appointment with a specialist had been scheduled.

In a health service request dated September 30, 2012, plaintiff asked again about his surgery, stating that he is "in extreme pain all day all the time."  In response, defendant Suliene stated that his appointment was "coming up."

In a health service request dated October 11, 2012, plaintiff stated again that he was in "extreme pain," his medication is not working "at all" and he could not sleep or use his right arm" because of his shoulder pain.  He asked for stronger pain medication "today" and asked why he "keep[s] getting the runaround" on surgery.  In response, defendant Suliene stated that physical therapy had been scheduled for his shoulder and she prescribed amitriptyline, acetaminophen and ibuprofen for his pain.

In a health service request directed to defendant Karen Anderson, the health services unit manager, plaintiff complained that he was in "unbearable pain" and needed surgery and better pain medication.  In response, Anderson wrote that defendant Suliene was monitoring plaintiff's medical needs and that Suliene had written new orders for medication and physical therapy on October 12. Anderson has no authority to approve a referral for surgery.

In a grievance dated October 16, 2012, plaintiff complained that his shoulder was in extreme pain and he had been waiting for surgery for more than two months.  The grievance examiner recommended dismissal of the grievance on the ground that "[i]t is the doctor's

9

determination to make regarding what course of treatment to pursue." On appeal, defendant Becher, acting as the reviewing authority, dismissed the complaint with the modification that plaintiff's medical classification should be updated so that he would not be required to engage in any activities that contributed to his shoulder pain.

In a health service request dated November 11, 2012, plaintiff wrote that he needed stronger pain medication because the acetaminophen does "not work at all" and his "shoulder is killing" him. In response, health care staff checked a box indicating that plaintiff was scheduled to see a nurse.

In a health service request dated November 12, 2012, plaintiff stated that he "must have a brace or sling for [his] shoulder ASAP!" because his shoulder "keeps falling out of place, causing [him] extreme pain, [he] cannot sleep on it at all and [he] cannot use it at all, without it causing [him] extreme pain." In addition, plaintiff asked for stronger pain medication because "this is affecting [his] everyday life and sleep every night." In response, health care staff referred plaintiff to a memorandum dated November 14, 2012, from "Dr. Trinidad," stating that he "went to the unit to see [plaintiff] but was informed [plaintiff was] on a pass to HSU."

On November 12, 2012, plaintiff was scheduled for an orthopedic consultation. The appointment was rescheduled by "CCI" because of an "emergency trip that needed to go out."

On November 13, 2012, staff in the health services unit met with plaintiff.  Staff advised plaintiff to alternate between ibuprofen and acetaminophen and continue icing his shoulder.  When plaintiff asked for stronger medication, he was referred to the doctor for review.

In a health service request dated December 8, 2012, plaintiff stated again that his shoulder was in extreme pain.  In response, health care staff stated that plaintiff should continue taking acetaminophen and ibuprofen.

On December 12, 2012, plaintiff met with defendant Suliene.  She recommended restarting the physical therapy "to see if we could strengthen his muscles and increase range in motion in his shoulder.  This, in turn, would reduce pain."  Suliene Decl. ¶ 70, dkt. #33.  In addition, she wished to restart treatment with nonsteroidal anti-inflammatory medications and ice.  She discontinued his prescription for ibuprofen and replaced it with naproxen.

In a health service request dated December 12, 2012, plaintiff stated that defendant Suliene had told him during his appointment that he had not had surgery on his shoulder "because of lack of staffing and cost."  Plaintiff asked whether he could get surgery sooner if he agreed to pay for it. In response, health care staff stated that an appointment was scheduled with the orthopedics department.

On December 13, 2012, plaintiff was seen in the health services unit for swelling in

11

his throat after taking naproxen.  As a result, the naproxen was discontinued.

On December 19, 2012, plaintiff met with defendant Suliene in response to complaints of shoulder pain. She prescribed meloxicam (a non-steroidal anti-inflammatory drug), acetaminophen and capsaicin cream.

On December 28, 2012, plaintiff met with the physical therapist.

In a health service request dated December 30, 2012, plaintiff stated that his "shoulder pain is 10!"  In response, health care staff wrote that plaintiff already had an order for acetaminophen and capsaicin cream.

In a health service request dated December 31, 2012, plaintiff wrote that his shoulder pain "keeps getting worse."  In response, health care staff told plaintiff to "discuss with MD at your next appointment."

On January 7, 2013, plaintiff was scheduled for an orthopedic consultation, but the appointment was canceled and rescheduled by the health care provider, who determined that plaintiff should be seen in the sports medicine clinic rather than orthopedics.

In a health service request dated January 15, 2013, plaintiff stated that his shoulder had become dislocated "once again," causing him excruciating pain.  In response, defendant Suliene stated that plaintiff was scheduled for an appointment later that month.  Plaintiff addressed a similar request to defendant Anderson and received a similar response.

On January 22, 2013, plaintiff met with defendant Suliene.  (Defendants say that

plaintiff told Suliene that he was feeling "so-so."  Plaintiff says that he told her that the meloxicam was causing him to vomit and that his shoulder pain was so unbearable that it prevented him from sleeping.)

On February 18, 2013, plaintiff had an appointment with the sports medicine clinic. However, the appointment was rescheduled "by CCI" because another prisoner had to be transported to the hospital for urgent cardiac surgery.

In a health service request dated March 2, 2013, plaintiff stated that his right shoulder was in "more extreme pain . . . now than ever!!" and he asked again about the delay in his surgical consultation.  In response, health care staff wrote that plaintiff is "scheduled to be seen at UW very soon."

In a health service request dated March 15, 2013, plaintiff complained again about extreme pain and asked why he was being refused surgery.  In response, health staff wrote that a surgical consultation was scheduled.

On March 18, 2013, plaintiff had an appointment with a doctor at the UW Hospital Orthopedics Department.  (The parties do not explain why plaintiff was taken to the orthopedics department despite the earlier conclusion that he should be taken to the sports medicine clinic.)  After examining plaintiff, the doctor wrote:

> This is a 40-year-old, right-hand-dominant inmate with right shoulder pain, feelings of instability and mechanical symptoms for the past 3 years after an acute dislocation. I feel that he is getting some mechanical symptoms which

13

could be related to the loose body as well as some instability from his posterior glenoid deficiency secondary to the donor site and hypoplastic glenoid in addition to the chronic labral tears. I am going to discuss this case with Dr. Scerpella to see if she feels that he would be a surgical candidate, and will have the patient to [sic] return to clinic in 2 weeks for a surgical discussion.

On March 19, 2013, defendant Suliene ordered a followup appointment with the orthopedics department in  two weeks.

In a health service request dated March 19, 2013, plaintiff asked for the name of the person who schedules appointments and the reason why his appointments were being canceled.  In response, "Ms. Felton" wrote "Appt originally scheduled for 3/18/13 cancelled and moved to earlier date.  A more urgent appt came and it was moved back to 3/18/13."

On April 5, 2013, defendant Suliene retired from state service and was no longer involved in plaintiff's medical care.

In a health service request dated April 8, 2013, plaintiff stated that he was in extreme pain and asked for pain medication and about the status of his surgery.  (The parties do not explain why plaintiff did not have a two-week followup appointment with the orthopedics department.)  In response, health care staff wrote that plaintiff's followup appointment "is scheduled" and that plaintiff was scheduled to see the prison doctor as well.

In a health service request dated April 9, 2013, plaintiff stated that he was in extreme pain and he asked why he had not been sent back to UW for a followup appointment.  In addition, he asked for pain medication "that will work or at least help."  In response, health

14

care staff stated, "you have an ortho appt."

In April 2013, defendant Becher was "made aware" that plaintiff was still waiting for shoulder surgery.  Becher discussed the delay with the nursing supervisor.  (The parties do not describe the content of that discussion or what came of it, if anything.)

On April 15, 2013, plaintiff had an appointment with a doctor in the orthopedics department. The doctor recommended shoulder surgery.  On April 25, 2013, health care staff submitted a request for approval of the surgery; on April 29, 2013, it was approved.

On June 18, 2013, plaintiff had surgery on his right shoulder.


OPINION

I.  EIGHTH AMENDMENT

All of plaintiff's claims relate to defendants' alleged refusal to provide medical treatment for his shoulder.  In their motion for summary judgment, defendants do not deny that plaintiff can meet the first two elements of an Eighth Amendment claim, which are that he had a serious medical need related to his shoulder and that they were aware of that need. Greeno v. Daley, 414 F.3d 645, 652 (7th Cir. 2005). Rather, defendants argue that no reasonable jury could find that they were "deliberately indifferent" to plaintiff's health, which means that they consciously failed to take reasonable measures to treat plaintiff.  Id. at 653.  In the alternative, they argue that they are entitled to qualified immunity because, even when the facts are viewed in the light most favorable to plaintiff, their conduct did not violate clearly established law.  Humphries v. Milwaukee County, 702 F.3d 1003, 1006 (7th

15

Cir. 2012) ("The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") (internal quotations omitted).   Because defendant Suliene was plaintiff's primary care provider during the relevant time period, I will consider plaintiff's allegations against her first.

## A.   Defendant Dalia Suliene

### 1.   Delay in providing treatment

Plaintiff began complaining about his shoulder pain in November 2011, but he did not receive surgery on his shoulder until June 2013.  I understand plaintiff to be arguing that defendant Suliene delayed his surgery in two ways. First, she failed to act promptly to obtain appointments outside the prison that plaintiff needed before having surgery.  Second, she prevented plaintiff from keeping his medical appointments once they were made.

As an initial matter, defendants cite Langston v. Peters, 100 F.3d 1235 (7th Cir. 1996), for the proposition that "mere delay does not constitute deliberate indifference," Dfts.' Br., dkt. #31, at 22, but that is an incomplete statement.   In Langston, 100 F.3d at 1240, the court stated that a one-hour delay in obtaining medical care was not unreasonable when the plaintiff had failed to provide "verifying medical evidence" showing that the delay harmed him.  The Court of Appeals for the Seventh Circuit has held on multiple occasions that a defendant's delay in providing medical care may violate the Eighth Amendment if the delay caused the prisoner to suffer needless pain, which is what plaintiff alleges in this case.

16

Smith v. Knox County Jail, 666 F.3d 1037, 1039-40 (7th Cir. 2012) ("[D]eliberate indifference to prolonged, unnecessary pain can itself be the basis for an Eighth Amendment claim."); Rodriguez v. Plymouth Ambulance Service, 577 F.3d 816, 832 (7th Cir. 2009) (state employees could be liable for four-day delay in treating prisoner who complained that his IV was causing him serious pain); Grieveson v. Anderson, 538 F.3d 763, 779-80 (7th Cir. 2008) (delay in treating pain for day and a half could be Eighth Amendment violation); Walker v. Benjamin, 293 F.3d 1030, 1040 (7th Cir. 2002) (delay in providing pain medication stated claim under Eighth Amendment). Thus, the question is not whether plaintiff adequately alleged harm, but whether he has adduced evidence that defendant Suliene consciously failed to take reasonable steps to provide treatment more quickly.

With respect to scheduling outside appointments, it is undisputed that defendant Suliene requested approval for an MRI arthrogram three days after the orthopedic consultant recommended it; she requested a followup appointment with the consultant the same day as plaintiff's first appointment; she requested approval for a surgical orthopedic consultation the same day that the orthopedic consultant recommended it; and one day after plaintiff's surgical orthopedic consultation, she requested a followup appointment. At that point, defendant Suliene retired and was no longer involved in plaintiff's medical care. Thus, there is no basis for concluding that defendant Suliene was slow in making appointments for plaintiff.

Plaintiff seems to believe that defendant Suliene should have done more to get the outside providers to see him more quickly. However, he does not cite any evidence showing

17

that Suliene had any control over the scheduling practices of outside providers.  Instead, he cites a department policy called "Consultation with Off-Site Providers," which provides instructions to prison doctors regarding requests for consultation with specialists. Dkt. #85-47.  One of these states that the referring doctor "shall indicate an appropriate timeframe for the appointment."  Id. at 3.

Plaintiff's reliance on this policy is misplaced.  First, plaintiff has not provided any evidence showing that defendant Suliene requested any timeframe from the hospital providers for any of plaintiff's appointments.  Second, the portion of the policy plaintiff cites relates to obtaining approval from the *department* for offsite care. Id. at 2.  ("Specialty consultations shall be approved by the Medical Director, Mental Health Director, Dental Director, Clinical Review Committee or Nurse Reviewer, as indicated in DAI Policy 500.10.12 prior to making the appointment.").  The policy does not suggest that defendant Suliene had authority to require an outside provider to see plaintiff at a particular time.

Plaintiff may mean to argue that Suliene should have specified that his need for care was urgent to improve his chances of getting a faster appointment.   If that is plaintiff's argument, he has not adduced any evidence that a request by Suliene would have guaranteed speedier treatment.  In any event, it is difficult to see how Suliene could be blamed for not identifying plaintiff's need for surgery as an emergency when she was simply following the recommendations of the specialists that plaintiff saw.  Smego v. Mitchell, 723 F.3d 752, 758 (7th Cir. 2013) ("Doctors may rely on the representations of their colleagues absent clear evidence that those representations are known to be false.").  Although plaintiff says that

18

the orthopedic consultant told him that he needed surgery "as soon as possible," he does not cite any evidence that the consultant communicated the same thing to Suliene. Rather, the consultant averred in her declaration that she took no action to speed up the process because she did not believe that plaintiff required emergency treatment.

With respect to appointments that were postponed, the undisputed facts show that some of these were postponed by the outside provider and others were postponed because transportation was not available for plaintiff. Although plaintiff says in his brief that defendant Suliene "allowed" the delays, dkt. #84 at 4, he has not adduced any evidence that Suliene caused them or could have prevented them.

The two exceptions are the delays in his scheduled appointments for an MRI arthrogram. According to plaintiff, Suliene failed to tell him about the first appointment and then tried to get him to sign a refusal form for the second appointment. As a result, his MRI arthrogram was delayed by two months. From plaintiff's testimony, a jury could infer that Suliene gratuitously delayed plaintiff's treatment despite knowing that it would prolong his pain.

Of course, defendant Suliene denies that she delayed plaintiff's care. Her version is that plaintiff refused to attend his appointments on both occasions. Although it may seem unlikely that Suliene would schedule plaintiff's appointments promptly and then attempt later to prevent him from attending those appointments, I may not weigh the evidence or make credibility determinations on a motion for summary judgment. Washington v. Haupert, 481 F.3d 543, 550 (7th Cir. 2007).

Alternatively, defendants argue that Suliene is entitled to qualified immunity, but they do not develop the argument; all but one paragraph of this section of their brief is boilerplate.  They do not say anything at all about the delay in obtaining an MRI arthrogram.  In any event, the Court of Appeals for the Seventh Circuit has stated that the merits of an Eighth Amendment claim and qualified immunity "effectively collapse into one" question in many circumstances.  Walker, 293 F.3d at 1037.  Because the legal standard for an Eighth Amendment medical care claim has been clearly established for many years and the disputes raised in such claims largely are factual rather than legal, "[i]f there are genuine issues of fact concerning th[e] elements [of the claim], a defendant may not avoid trial on the grounds of qualified immunity." Id.  See also Hayes v. Snyder, 546 F.3d 516, 528 (7th Cir. 2008) ("It has been established for decades that prison physicians violate inmates' constitutional rights when they deliberately disregard an inmate's serious medical condition, and only a trial can resolve the facts that are in dispute.").  Accordingly, I am denying defendants' motion for summary judgment as it relates to plaintiff's claim that defendant Suliene delayed his MRI arthrogram.

2. Pain medication

I understand plaintiff to be arguing that defendant Suliene violated the Eighth Amendment by continuing to prescribe ineffective medication for him, even when he reported that it made him sick.  He relies on the well-established proposition that "medical personnel cannot simply resort to an easier course of treatment that they know is

ineffective." <u>Johnson v. Doughty</u>, 433 F.3d 1001,1013 (7th Cir. 2006).  <u>See also</u> <u>Gonzalez v. Feinerman</u>, 663 F.3d 311, 314 -15 (7th Cir. 2011) ("[P]hysicians [a]re obligated not to persist in ineffective treatment."); <u>Arnett v. Webster</u>, 658 F.3d 742, 754 (7th Cir. 2011) ("[A] medical professional's actions may reflect deliberate indifference if he chooses an easier and less efficacious treatment without exercising professional judgment."); <u>Berry v. Peterman</u>, 604 F.3d 435, 441 (7th Cir. 2010) ("[A] doctor's choice of the easier and less efficacious treatment for an objectively serious medical condition can still amount to deliberate indifference for purposes of the Eighth Amendment."); <u>Greeno</u>, 414 F.3d at 655 (noting that persistence in a course of treatment "known to be ineffective" violates the Eighth Amendment).

Defendants make three arguments in support of their motion for summary judgment on this claim.  First, they say that defendant Suliene did not persist in providing plaintiff ineffective treatment; rather, "when Dr. Suliene was told by McGhee that the pain medication was not working, she willingly prescribed different medications."  Dfts.' Br., dkt. #31, at 24.  Although it is true that defendant Suliene did not keep plaintiff on the same medication for the entire year and a half that she treated him, it is also true that she would treat him with the same medication for several months despite plaintiff's continuous protests that it was ineffective and in some cases made him sick.  This is inconsistent with Suliene's own opinion that a patient should not continue taking the same medication for more than 30 days if it is not providing relief.  Dfts.' Resp. to Plt.'s PFOF ¶ 34, dkt. #105.  According to plaintiff, the reason Suliene gave for sticking to the same medications was that she simply

refused to help plaintiff with his pain.  That testimony supports the drawing of inference that defendant Suliene knew that her treatment would be ineffective, but she refused to consider other options.

Further, when defendant Suliene did change plaintiff's medications, sometimes she prescribed the same medication again that had been tried unsuccessfully before. She does not deny that plaintiff was in severe pain from November 2011 until she retired in April 2013 and she does not provide any medical reason for refusing to prescribe stronger medication or even for choosing the medications that she did.  Although Suliene was acting within her discretion under the Eighth Amendment in treating plaintiff's pain conservatively at first, on the current record, a reasonable jury could find that Suliene disregarded plaintiff's pain by failing to use medical judgment when it became clear her treatment was not providing any relief.

Defendants' second argument is that it is impossible to tell whether the medication defendant Suliene prescribed might have been effective because plaintiff refused to take it. However, defendants' proposed finding of fact on this issue is vague, stating that plaintiff was "frequently noncompliant with his medications," Dfts.' PFOF ¶ 124, dkt. #32, without identifying particular dates or medications.  In any event, plaintiff avers in his declaration that he always took the medication he received for several weeks until it became clear to him that it was ineffective.  Plt.'s Decl. ¶ 92, dkt. #85.  Particularly because defendant Suliene has admitted that plaintiff should not take ineffective pain medication for more than a month, I cannot resolve this issue as a matter of law.

22

Finally, defendants say that doctors "must take caution before prescribing opioids . . . in the prison setting" because prisoners "often have substance abuse problems" and there is a risk of "diversion of medications."  Dfts.' Br., dkt. #31, at 24.  The risk of substance abuse is a valid concern, which I have recognized in previous cases.  E.g., Banks v. Cox, No. 09-cv-9-bbc, 2010 WL 693517, *7 (W.D. Wis. 2010);  DeBoer v. Luy,  No. 01-C-382-C, 2002 WL 32345414, *4 (W.D. Wis. 2002).  However, in the context of this case, defendants' argument has several problems.

First, it is not clear whether opioids were the only other option defendant Suliene could have tried as opposed to stronger doses of other types of medication.  Second, even if opioids were the next step, defendant Suliene does not suggest that she declined to consider prescribing them for plaintiff because of a concern that she had about plaintiff's potential to abuse the drug or a belief that plaintiff was exaggerating his pain.  Even now, defendants do not suggest that plaintiff has a history of substance abuse and they identify no reason specific to plaintiff for denying him a stronger medication.  Because defendants concede that it is appropriate under some circumstances to use stronger medications to treat chronic pain conditions, Dfts.' PFOF ¶ 26, dkt. #32, there must be some explanation for not considering them when other medications are not effective.  To the extent that defendant Suliene has a personal view that it is never appropriate to prescribe stronger medication for long-term pain, that view would be inconsistent with the rule that a medical professional must "consider an individual inmate's condition in making treatment decisions."  Roe v. Elyea, 631 F.3d 843, 862-63 (7th Cir. 2011).

With respect to qualified immunity, it is clearly established that prison physicians may not continue to prescribe treatment that they know is ineffective.  Because there are genuine disputes on the question whether defendant Suliene violated that rule, I am denying defendants' motion for summary judgment as to this claim.


3.  <u>Other issues</u>

Plaintiff raises two other issues in his summary judgment brief: (1) defendant Suliene refused to prescribe a brace or sling for him; and (2) Suliene refused to discuss his shoulder problems during appointments for other medical concerns.  Both of these claims fail for multiple reasons.

First, I did not allow plaintiff to proceed on either of these claims because they were not included in his complaint.  It is well established that plaintiffs may not raise new claims in response to a motion for summary judgment.  <u>EEOC v. Lee's Log Cabin, Inc.</u>, 546 F.3d 438, 443 (7th Cir. 2008).  Second, with respect to the brace or sling, plaintiff has not adduced any evidence that defendant Suliene was aware that plaintiff even wanted a brace or sling (another health care staff member responded to plaintiff's request on this issue) or that a brace or sling would have been helpful to someone in his situation.  Third, with respect to the alleged refusal to discuss plaintiff's shoulder, plaintiff does not explain how this harmed him.  To the extent that plaintiff is alleging that Suliene refused to address his complaints of shoulder pain, he is free to raise this issue in the context of his claim regarding the lack of adequate pain medication, but it cannot survive as a standalone claim.

B.  Defendants Karen Anderson and Lon Becher

Defendants Anderson's and Becher's involvement in plaintiff's medical care was limited.  Anderson was the health services unit manager; Becher was the nursing coordinator. Neither is a physician.

Defendant Anderson responded to two health service requests in which plaintiff complained about his shoulder.  In both responses, Anderson deferred to the judgment of defendant Suliene.  Becher was present at one of plaintiff's earlier appointments with defendant Suliene in November 2011; he was the reviewing authority on one of plaintiff's grievances about his shoulder in October 2012; and he had a discussion with a nursing supervisor about the delay in surgery in April 2013.

Plaintiff has not adduced any evidence showing what authority defendants Becher and Anderson had to require defendant Suliene or an outside health care professional to give plaintiff different or faster treatment.  Even if they had such authority, plaintiff does not explain in any detail why Becher and Anderson would not be entitled to rely on the other providers' opinions regarding the appropriate treatment.  Smego, 723 F.3d at 758. Accordingly, I am granting defendants' motion for summary judgment on plaintiff's Eighth Amendment claim as to defendants Becher and Anderson.

II.  NEGLIGENCE

I allowed plaintiff to proceed on claims that defendant Suliene acted negligently by delaying his surgery and refusing to provide him stronger pain medication and that

defendants Becher and Anderson acted negligently by failing to supervise Suliene. Defendants have moved for summary judgment with respect to all of these claims.

Initially, defendants argue that the negligence claims must be dismissed as to defendant Becher because plaintiff did not name that defendant in the notice of claim, as required by Wis. Stat. § 893.82(3) ("[N]o civil action . . . may be brought against any state . . . employee . . . on account of any act . . . committed in the course of the discharge of the . . . employee's duties . . . unless . . . the claimant in the action . . . serves upon the attorney general written notice of a claim stating . . . the name of the state . . . employee . . . involved."). See also Modica v. Verhulst, 195 Wis. 2d 633, 647, 536 N.W.2d 466, 473 (Ct. App. 1995) (dismissing claim for failure to identify defendant by name in notice). Plaintiff does not respond to this argument, so he has conceded it. Bonte v. U.S. Bank, N.A., 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument—as the Bontes have done here—results in waiver."). With respect to defendant Anderson, plaintiff has not adduced any evidence that Anderson had supervisory authority over Suliene, so his negligent supervision claim fails at the outset.

With respect to plaintiff's negligence claims against defendant Suliene, I conclude that the result is the same as plaintiff's Eighth Amendment claims. Because plaintiff has not adduced any evidence that Suliene could have scheduled his appointments with outside providers more quickly, no reasonable jury could find that she was negligent in that respect. However, construing the facts in favor of plaintiff, a reasonable jury could find that Suliene was negligent in failing to insure that plaintiff received an MRI arthrogram and failing to

26

provide adequate pain medication.  Although defendants argue that plaintiff's negligence claims must be dismissed because he does not have a medical expert, I conclude that "no expert testimony is needed [in this case because] the symptoms exhibited by the plaintiff are not beyond a layperson's grasp." <u>Gil v. Reed</u>, 381 F.3d 649, 659 (7th Cir. 2004).


ORDER

IT IS ORDERED that the motions for summary judgment filed by defendants Dalia Suliene, Karen Anderson and Lon Becher, dkt. ##30 and 67, are DENIED with respect to plaintiff Laderian McGhee's claims that defendant Suliene interfered with plaintiff's MRI arthrogram appointment and failed to treat plaintiff's shoulder pain adequately, in violation of the Eighth Amendment and common law negligence.  Defendants' motions for summary judgment are GRANTED in all other respects.  Plaintiff's complaint is DISMISSED as to defendants Anderson and Becher.

Entered this 12th day of February, 2014.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge